﻿Citation Nr: AXXXXXXXX
Decision Date: 02/25/19 Archive Date: 02/25/19

DOCKET NO. 181030-767
DATE: February 25, 2019

ORDER

Entitlement to service connection for bilateral hearing loss is granted.

Entitlement to service connection for tinnitus is granted.

Entitlement to a 50 percent rating for migraine headaches is granted, subject to controlling regulations governing the payment of monetary awards.

Entitlement to a 70 percent rating, but no higher, for other specified trauma/stressor related disorder (previously diagnosed as posttraumatic stress disorder (PTSD)) is granted, subject to controlling regulations governing the payment of monetary awards.

Entitlement to a total disability rating based on individual unemployability (TDIU) due to service-connected disabilities is granted, subject to controlling regulations governing the payment of monetary awards.

REMANDED

Entitlement to a rating in excess of 10 percent for type II diabetes mellitus is remanded.

FINDINGS OF FACT

1. The evidence is at least evenly balanced as to whether the Veteran’s bilateral hearing loss is related to noise exposure in service.

2. The evidence is at least evenly balanced as to whether the Veteran’s tinnitus is related to noise exposure in service.

3. During the period on appeal, the evidence is at least evenly balanced as to whether the Veteran’s migraine headaches were manifested by frequent completely prostrating attacks, productive of severe economic inadaptability.

4. During the period on appeal, the Veteran’s other specified trauma/stressor related disorder (previously diagnosed as PTSD) was manifested by occupational and social impairment with deficiencies in most areas, such as work, family relations, thinking, and mood; symptoms did not more nearly approximate both total social and occupational impairment.

5. During the period on appeal, the Veteran was service-connected for the following disabilities: other specified trauma/stressor related disorder (previously diagnosed as PTSD), now rated 70 percent disabling; migraine headaches, now rated 50 percent disabling; peripheral neuropathy of the right upper extremity, rated 30 percent disabling; peripheral neuropathy of the left upper extremity, rated 20 percent disabling; peripheral neuropathy of the right lower extremity, rated 20 percent disabling; peripheral neuropathy of the left lower extremity, rated 20 percent disabling; dermatophytosis, rated 10 percent disabling; type II diabetes mellitus, rated 10 percent disabling; and conjunctivitis, rated noncompensable; the Board is also awarding service connection for bilateral hearing loss and tinnitus and the AOJ will assign initial disability ratings for these disabilities in a future decision; the Veteran’s combined disability rating was 100 percent.

6. During the period on appeal, the Veteran’s service-connected disabilities precluded all substantially gainful employment for which his education and occupational experience would have otherwise qualified him.

CONCLUSIONS OF LAW

1. With reasonable doubt resolved in favor of the Veteran, the criteria for service connection for bilateral hearing loss are met. 38 U.S.C. §§ 1110, 5107; 38 C.F.R. §§ 3.102, 3.303, 3.385. 

2. With reasonable doubt resolved in favor of the Veteran, the criteria for service connection for tinnitus are met. 38 U.S.C. §§ 1110, 5107; 38 C.F.R. §§ 3.102, 3.303.

3. With reasonable doubt resolved in favor of the Veteran, the criteria for a 50 percent rating for migraine headaches are met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 4.1, 4.2, 4.7, 4.10, 4.20, 4.21, 4.124a, Diagnostic Code (DC) 8100. 

4. The criteria for a 70 percent rating, but no higher, for other specified trauma/stressor related disorder (previously diagnosed as PTSD), are met. 38 U.S.C. §§ 1155, 5107(b); 38 C.F.R. §§ 4.1, 4.2, 4.3, 4.7, 4.10, 4.21, 4.125, 4.126, 4.130, Diagnostic Code (DC) 9411.

5. The criteria for a TDIU due to service-connected disabilities are met. 38 U.S.C. §§ 1155, 5107(b); 38 C.F.R. §§ 3.102, 3.340, 3.341, 4.16. 

REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

On August 23, 2017, the President signed into law the Veterans Appeals Improvement and Modernization Act, Pub. L. No. 115-55 (to be codified as amended in scattered sections of 38 U.S.C.), 131 Stat. 1105 (2017), also known as the Appeals Modernization Act (AMA). This law creates a new framework for Veterans dissatisfied with VA’s decision on their claim to seek review. The Veteran chose to participate in VA’s test program RAMP, the Rapid Appeals Modernization Program. This decision has been written consistent with the new AMA framework.

The Veteran served on active duty from March 1967 to March 1969, which includes service in the Republic of Vietnam. These matters come before the Board of Veterans’ Appeals (Board) from July 2014 and June 2017 rating decisions. In the July 2014 decision, the agency of original jurisdiction (AOJ) denied service connection for bilateral hearing loss and tinnitus. In the June 2017 decision, the AOJ denied ratings in excess of 30 percent for migraine headaches, in excess of 30 percent for the service-connected psychiatric disability, and in excess of 10 percent for type II diabetes mellitus.

The Veteran selected the Higher-Level Review lane when he submitted the RAMP election form. Accordingly, an October 2018 RAMP rating decision considered the evidence of record as of the date VA received the RAMP election form (April 26, 2018). In that decision, the AOJ awarded an increased (50 percent) rating for other specified trauma/stressor related disorder, from December 7, 2017, but denied the remaining claims on appeal. The Veteran timely appealed this RAMP rating decision to the Board and requested the evidence submission review lane, allowing him 90 days to submit evidence pertinent to his claims.

As a final preliminary matter, the Veteran was unemployed during the period on appeal with respect to his claims for increased ratings for migraine headaches, other specified trauma/stressor related disorder, and type II diabetes mellitus. Also, evidence received during the period on appeal reflects that he was unable to work due to service-connected disabilities. Entitlement to a TDIU may be an element of an increased rating claim. Rice v. Shinseki, 22 Vet. App. 447 (2009). Entitlement to a TDIU is raised where a veteran: (1) submits evidence of a medical disability; (2) makes a claim for the highest rating possible; and (3) submits evidence of unemployability. Roberson v. Principi, 251 F.3d 1378 (Fed. Cir. 2001); Rice v. Shinseki, 22 Vet. App. 447, 453 (2009). Given the evidence of current disabilities, the Veteran’s claims for the highest ratings possible for his service-connected migraine headaches, other specified trauma/stressor related disorder, and type II diabetes mellitus, and the evidence of unemployability due to service-connected disabilities during the period on appeal, the issue of entitlement to a TDIU during that period is properly before the Board under Rice.

I. Service Connection

Service connection will be granted if the evidence demonstrates that current disability resulted from an injury suffered or disease contracted in active military, naval, or air service. 38 U.S.C. § 1110; 38 C.F.R. § 3.303(a). Establishing service connection generally requires competent evidence of three things: (1) current disability; (2) in-service injury or disease; and (3) a relationship between the two. Saunders v. Wilkie, 886 F.3d 1356, 1361 (Fed. Cir. 2018). Consistent with this framework, service connection is warranted for a disease first diagnosed after service when all the evidence, including that pertinent to service, establishes that the disease was incurred in service. 38 C.F.R. § 3.303(d).

Hearing loss is considered to be a disability for VA purposes when the auditory threshold in any of the frequencies 500, 1000, 2000, 3000, or 4000 Hertz is 40 decibels or greater; or when the auditory thresholds for at least three of these frequencies are 26 decibels or greater; or when speech recognition thresholds using the Maryland CNC Test are less than 94 percent. 38 C.F.R. § 3.385.

When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, the Secretary shall give the benefit of the doubt to the claimant. 38 U.S.C. § 5107; see also Gilbert v. Derwinski, 1 Vet. App. 49, 53 (1990).

Entitlement to service connection for bilateral hearing loss and tinnitus

The Veteran contends that he has current bilateral hearing loss and tinnitus caused by exposure to loud noise in service.

The AOJ found that the Veteran has current diagnoses of tinnitus and bilateral hearing loss as defined by VA and that he experienced noise exposure in service (see October 2018 RAMP rating decision).

The remaining question in this case is whether a causal relationship or nexus exists between the Veteran’s hearing loss and tinnitus and the noise exposure in service. The Board finds, for the following reasons, that the evidence is at least evenly balanced as to whether the bilateral hearing loss and tinnitus are related to noise exposure in service. 

As for whether the Veteran’s current hearing loss and tinnitus are related to his in-service noise exposure, there are conflicting medical opinions. The Board must analyze the credibility and probative value of the evidence, account for the evidence which it finds to be persuasive or unpersuasive, and provide the reasons for its rejection of any material evidence favorable to the Veteran. See Gabrielson v. Brown, 7 Vet. App. 36, 39-40 (1994). The Board may favor one medical opinion over another, provided an adequate statement of reasons or bases is provided. See Owens v. Brown, 7 Vet. App. 429, 433 (1995).

In a November 2013 VA otolaryngology consultation note, a VA physician (A.K). reported that the Veteran served in Vietnam and was exposed to almost constant combat-related noise from M-60 machine guns, mortars, and rockets. The physician opined that the Veteran’s hearing loss and tinnitus were “undoubtedly caused at least in part by exposure [t]o excessive noise while s[e]rving in combat.” There was no further explanation or rationale provided for this opinion.

The audiologist who conducted a July 2014 VA audiological examination opined that the Veteran’s hearing loss was not likely (not “at least as likely as not”/“50 percent probability or greater”) caused by or a result of service. The examiner reasoned that the Veteran’s hearing thresholds were within normal limits at the time of his entrance and separation from service. According to the American College of Occupational Medicine Noise and Hearing Conservation Committee, a noise induced hearing loss will not progress once it is stopped. Therefore, the Veteran’s hearing loss was not likely (“less likely than not”) related to military noise exposure/acoustic trauma.

In August 2014 and June 2015, A.K. again opined that the Veteran’s bilateral hearing loss and tinnitus were likely (“more likely than not”) related to his history of excessive noise exposure in service. A.K. noted in June 2015 that the Veteran was exposed to almost constant noise from military weaponry in service. Also, he was the victim of a gas explosion in service, was thrown to the ground, and reported a temporary threshold shift right after the explosion. There was no further explanation or rationale provided for these opinions.

In July 2016, a VA audiologist reviewed the Veteran’s claims file and explained that his hearing was within normal limits (500-4000 Hertz) bilaterally at the time of his separation from service. There were no positive significant threshold shifts greater than normal measurement variability at any frequency. Therefore, there was no evidence of noise injury/acoustic trauma. The Institute of Medicine reported that, based on current understanding of auditory physiology, hearing loss from noise injuries occurs immediately following exposure, and that there is insufficient evidence to conclude that permanent hearing loss directly attributable to noise exposure will develop long after noise exposure. The Veteran’s service treatment records did not contain any evidence of complaints, treatment, or diagnosis of hearing loss or tinnitus. The first documented report of tinnitus was during a 2013 VA audiological evaluation (over 43 years after separation from service). Given that there was no evidence of hearing loss or noise injury/acoustic trauma in service (based upon objective evidence and audiograms in the Veteran’s service treatment records), that the first documentation of tinnitus was over 43 years after separation from service, that the Veteran reported post-service occupational noise exposure as a corrections officer, and that tinnitus is most often a symptom associated with hearing loss, it was not likely (“less likely than not”) that the Veteran’s tinnitus was caused by or the result of military noise exposure.

In September 2016, the VA audiologist who provided the July 2016 opinion explained, in pertinent part, that the Veteran was first evaluated by A.K. in November 2013 (43 years following his separation from service). The audiologist acknowledged A.K.’s opinion and noted that while noise exposure was conceded, A.K.’s opinion was rendered without review of the Veteran’s service treatment records and the opinion was based on unsupported testimony which directly contradicted the objective evidence available in his service treatment records. The Veteran’s hearing was within normal limits (500-4,000 Hertz) bilaterally at the time of his separation from service. There were no positive significant threshold shifts greater than normal measurement variability at any frequency. Thus, there was no evidence of noise injury/acoustic trauma. There was no documented complaint, diagnosis, or treatment for hearing loss or tinnitus for 43 years following separation from service and the Veteran reported in 2013 that he had experienced decreased hearing acuity bilaterally for “a couple of years.” Given that there was no objective evidence of noise injury/acoustic trauma, there was no basis on which to conclude that the Veteran’s claimed hearing loss or tinnitus were associated with such injuries. In the absence of an objectively verifiable noise injury, the association between the claimed hearing loss and tinnitus and noise exposure was purely speculative. Given that A.K.’s opinion directly contradicted the objective evidence of record, and given that one would have to accept the scientifically unsubstantiated theory that the Veteran’s hearing loss and tinnitus occurred as a result of some latent, undiagnosed noise injury, the audiologist opined that the Veteran’s hearing loss and tinnitus were not likely (“less likely than not”) a result of military service, including noise exposure.

In November 2016, A.K. again noted that the Veteran was exposed to almost constant noise from military weaponry in service and that he was the victim of a gas explosion in service, was thrown to the ground, and reported a temporary threshold shift right after the explosion. A.K. opined that the Veteran’s hearing loss and tinnitus were undoubtedly likely (“more likely than not”) caused at least in part by exposure to excessive noise in service.

The July and September 2016 opinions are of little, if any, probative value, because they are both partially based upon an inaccurate history. Specifically, although the audiologist reasoned that the first evidence of hearing loss and tinnitus was not until 2013, the Veteran reported hearing loss during a March 1994 VA evaluation and reported both hearing loss and tinnitus during a November 1996 VA evaluation. Hence, the July and September 2016 opinions are, at least in part, based on an inaccurate history and therefore of little probative value. Monzingo v. Shinseki, 26 Vet. App. 97, 107 (2012) (“If the opinion is based on an inaccurate factual premise, then it is correct to discount it entirely”) (citing Reonal v. Brown, 5 Vet. App. 458, 461 (1993)). Furthermore, these opinions do not take into account the Veteran’s reports of a temporary threshold shift after his exposure to a gas explosion in service. In this regard, a medical opinion is inadequate if it is based solely on the absence of documentation in the record and does not take into account the Veteran’s reports of symptoms and history (even if recorded in the course of the examination). Dalton v. Peake, 21 Vet. App. 23 (2007).

The July 2014 opinion, by contrast, is based upon an examination of the Veteran, a review of his treatment records, and consideration of his reported history, and it is accompanied by a specific rationale that is consistent with the evidence of record. Thus, this opinion is entitled to substantial probative weight. See Nieves-Rodriguez v. Peake, 22 Vet. App. 295, 304 (2008) (most of the probative value of a medical opinion comes from its reasoning; threshold considerations are whether the person opining is suitably qualified and sufficiently informed).

As for the November 2013, August 2014, June 2015, and November 2016 opinions, although A.K. did not provide any detailed rationales for these opinions, he nonetheless concluded based upon his treatment of the Veteran and consideration of his reported history that his current hearing loss and tinnitus were caused by his noise exposure in service. These opinions are therefore entitled to some probative weight. See Monzingo, 26 Vet. App. at 106 (the fact that the rationale provided by an examiner “did not explicitly lay out the examiner’s journey from the facts to a conclusion,” did not render the examination inadequate); Acevedo v. Shinseki, 25 Vet. App. 286, 294 (2012) (medical reports must be read as a whole and in the context of the evidence of record).

In light of the above opinions, the Board finds that the evidence is at least evenly balanced as to whether the Veteran’s hearing loss and tinnitus are related to his noise exposure in service. As the reasonable doubt created by this relative equipoise in the evidence must be resolved in favor of the Veteran, entitlement to service connection for bilateral hearing loss and tinnitus is warranted. 38 U.S.C. §§ 1110, 5107 (b); 38 C.F.R. §§ 3.303, 3.102.

II. Increased Ratings

Disability evaluations are determined by evaluating the extent to which a veteran’s service-connected disability adversely affects his ability to function under the ordinary conditions of daily life, including employment, by comparing his symptomatology with the criteria set forth in the Schedule for Rating Disabilities (Rating Schedule). Separate diagnostic codes identify the various disabilities. 38 U.S.C. § 1155; 38 C.F.R. §§ 4.1, 4.2, 4.10.

If two evaluations are potentially applicable, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria required for that evaluation; otherwise, the lower evaluation will be assigned. 38 C.F.R. § 4.7. In view of the number of atypical instances it is not expected, especially with the more fully described grades of disabilities, that all cases will show all the findings specified. Findings sufficiently characteristic to identify the disease and the disability therefrom, and above all, coordination of rating with impairment of function will, however, be expected in all instances. 38 C.F.R. § 4.21.

In evaluating a disability, the Board considers the current examination reports in light of the whole recorded history to ensure that the current rating accurately reflects the severity of the condition. The Board has a duty to acknowledge and consider all regulations that are potentially applicable. Schafrath v. Derwinski, 1 Vet. App. 589 (1991). The medical as well as industrial history is to be considered, and a full description of the effects of the disability upon ordinary activity is also required. 38 C.F.R. §§ 4.1, 4.2, 4.10.

Where entitlement to compensation has already been established and an increase in the disability rating is at issue, the present level of disability is of primary concern. Although a rating specialist is directed to review the recorded history of a disability in order to make a more accurate evaluation, see 38 C.F.R. § 4.2, the regulations do not give past medical reports precedence over current findings. Francisco v. Brown, 7 Vet. App. 55 (1994). Staged ratings are, however, appropriate for an increased rating claim when the factual findings show distinct time periods where the service-connected disability exhibits symptoms that would warrant different ratings.

The relevant focus for adjudicating an increased rating claim is on the evidence concerning the state of the disability from the time period one year before the claim was filed until VA makes a final decision on the claim. Hart v. Mansfield, 21 Vet. App. 505 (2007). 

As an initial matter, the Board acknowledges that there are potentially outstanding Social Security Administration (SSA) disability records that have not been obtained. Nevertheless, VA is not required to obtain these records prior to adjudicating the issues of entitlement to increased ratings for migraine headaches and other specified trauma/stressor related disorder because the evidence reflects that the Veteran was awarded SSA disability benefits prior to at least November 2015. Thus, any records associated with the Veteran’s SSA disability claim pre-date the applicable period on appeal (i.e., since November 2015) with respect to the service-connected migraine headaches and psychiatric disability. Moreover, the evidence reflects that the Veteran’s SSA disability claim pertained to non-service-connected physical disability related to an injury at work in the 1990s (see the report of a December 2017 VA psychiatric examination). Therefore, any outstanding SSA disability records are not relevant to the increased rating issues on appeal. See Golz v. Shinseki, 590 F.3d 1317, 1321 (“The legal standard for relevance requires VA to examine the information it has related to medical records and if there exists a reasonable possibility that the records could help the veteran substantiate his claim for benefits, the duty to assist requires VA to obtain the records”).

1. Entitlement to a rating in excess of 30 percent for migraine headaches from November 18, 2015 to April 26, 2018

The Veteran’s migraine headaches are rated under 38 C.F.R. § 4.124a, DC 8100. Under DC 8100, migraines are rated as follows: a 30 percent rating is warranted for migraines with characteristic prostrating attacks occurring on an average of once a month over the last several months; and a 50 percent rating is warranted for migraines with very frequent completely prostrating and prolonged attacks productive of severe economic inadaptability. 38 C.F.R. § 4.124a, DC 8100.

The United States Court of Appeals for Veterans Claims (Court) has held that “nothing in DC 8100 requires that the claimant be completely unable to work in order to qualify for a 50% rating,” and that “[i]f ‘economic inadaptability’ were read to import unemployability, the appellant, if he met the economic-inadaptability criterion, would then be eligible for a rating of total disability based on individual unemployability resulting from a service-connected disability (TDIU) rather than just a 50% rating.” Pierce v. Principi, 18 Vet. App. 440, 446 (2004). In Pierce, the Court explained that where the Board refused to award a 50 percent disability rating for a headache disorder without discussing the “interplay” among the regulations found at 38 C.F.R. § 4.3 (reasonable doubt resolved in favor of claimant), 38 C.F.R. § 4.7 (higher possible evaluation applies “if disability picture more nearly approximates the criteria for that rating[;] otherwise, the lower rating will be assigned”), and 38 C.F.R. § 4.21 (all the elements specified in a disability grade need not necessarily be found although “coordination of rating with impairment of function will, however, be expected in all instances”), the Board committed reasons or bases error. Id. at 445. In addition, the Court acknowledged the Secretary’s concession that the phrase “productive of severe economic inadaptability” in DC 8100 should be construed as either “producing” or “capable of producing” severe economic inadaptability. Id. However, in Johnson v. Wilkie, 30 Vet. App. 245 (2018), the Court clarified that the criteria of DC 8100 are successive, and 38 C.F.R. §§ 4.7 and 4.21 are not for application.

The rating criteria do not define “prostrating.” Dorland’s Illustrated Medical Dictionary defines “prostration” as “extreme exhaustion or powerlessness.” Dorland’s Illustrated Medical Dictionary 1554 (31st ed. 2007). VA’s Adjudication Procedures Manual (M21-1) defines prostrating under DC 8100 as “causing extreme exhaustion, powerlessness, debilitation or incapacitation with substantial inability to engage in ordinary activities.” See M21-1, pt. III, Subpt. iv, Ch. 4, Sec. G(7)(b). The Adjudication Manual is not binding on the Board, DAV v. Sec’y of Veterans Affairs, 859 F.3d 1072, 1077 (Fed. Cir. 2017) (“The M21-1 Manual is binding on neither the agency nor tribunals”), but provides useful guidance in defining this term.

Considering the pertinent evidence in light of the applicable rating criteria and considerations, the Board finds that, for the following reasons, the evidence is at least evenly balanced as to whether the Veteran’s migraine headaches met or most closely approximated the criteria for a 50 percent rating during the entire period on appeal.

The Veteran’s claim for an increased rating for migraine headaches was received by VA on November 18, 2016.

A July 2016 VA neurology note indicates that the Veteran experienced severe headaches on a daily basis which were up to 9/10 in severity, throbbing in nature, located in the frontal and occipital areas, and occasionally associated with visualization of black dots, double vision, and dizziness. The headaches usually occurred in the morning and were worse with bright light and loud noise. The Veteran treated his headaches with 6 to 8 tablets of Tylenol per day and by lying down in a dark and quiet room. A diagnosis of multifactorial headaches was provided.

The Veteran reported during a February 2017 VA headache examination that he experienced headaches 3 to 4 times per week which lasted from a few minutes to a day at a time. The headaches were located on both sides of the head, pressure-like and stabbing nature, accompanied by photosensitivity and nausea, and treated with Tylenol. Characteristic prostrating attacks of headache pain occurred once every month, but there were no very prostrating and prolonged attacks of headache pain productive of severe economic inadaptability. There were no scars associated with the Veteran’s headaches and no other pertinent physical findings, complications, conditions, signs, or symptoms. The Veteran was diagnosed as having tension headaches.

A July 2017 VA neurology note reflects that the Veteran reported worsening headaches that occurred 1 to 2 times per week and were bifrontal, pounding and stabbing in nature, and 5-9/10 in severity. The headaches occasionally woke the Veteran up while he was sleeping (but also occurred during the day), lasted for hours to days at a time, and were associated with photophobia, phonophobia, and vertigo. The Veteran alleviated his headaches by lying down in a dark room and taking medication.

In light of the Veteran’s report during the July 2016 and July 2017 VA neurology evaluations of frequent (weekly to daily) severe headaches that lasted for hours to days at a time and required him to lie down in a dark and quiet room, and the fact that the information in the February 2017 examination report is inconsistent with the Veteran’s reports with respect to the frequency of prostrating attacks of headache pain, the Board finds that the evidence is at least evenly balanced as to whether his service-connected headaches were manifested by frequent completely prostrating and prolonged attacks during the entire period on appeal. Although the Veteran retired in 1993 due to a non-service-connected work injury and was unemployed during the period on appeal, the Board finds that the frequency and severity of his prostrating attacks of headache pain were such that they were capable of producing severe economic inadaptability. As the reasonable doubt created by this relative equipoise in the evidence must be resolved in favor of the Veteran, a 50 percent rating is warranted for his migraine headaches during the entire period on appeal. This is the maximum possible schedular rating under DC 8100. 

2. Entitlement to an increased rating for other specified trauma/stressor related disorder (previously diagnosed as PTSD), rated 30 percent disabling from November 9, 2015 through December 6, 2017 and 50 percent disabling from December 7, 2017 to April 26, 2018

When evaluating a mental disorder, the rating agency shall consider the frequency, severity, and duration of psychiatric symptoms, the length of remissions, and the Veteran’s capacity for adjustment during periods of remission. The rating agency shall assign a rating based on all the evidence of record that bears on occupational and social impairment rather than solely on the examiner’s assessment of the level of disability at the moment of the examination. 38 C.F.R. § 4.126 (a). When evaluating the level of disability from a mental disorder, VA will also consider the extent of social impairment, but shall not assign a rating solely on the basis of social impairment. 38 C.F.R. § 4.126 (b).

The schedular criteria for rating psychiatric disabilities incorporate the American Psychiatric Association’s Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-V). See 38 C.F.R. §§ 4.125, 4.130.

The Veteran’s other specified trauma/stressor related disorder is rated under 38 C.F.R. § 4.130, DC 9411. This disability is rated according to the General Rating Formula for Mental Disorders (General Rating Formula).

Under the General Rating Formula, a 30 percent rating is assigned when symptoms such as depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, or mild memory loss (such as forgetting names, directions, or recent events), cause occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and normal conversation).

A 50 percent rating is assigned when symptoms such as flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short and long-term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; or difficulty in establishing and maintaining effective work and social relationships cause occupational and social impairment with reduced reliability and productivity.

A 70 percent rating is assigned when symptoms such as suicidal ideation; obsessional rituals which interfere with routine activities; intermittently illogical, obscure, or irrelevant speech; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a worklike setting); or inability to establish and maintain effective relationships cause occupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood.

A 100 percent rating is assigned when symptoms such as gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; or memory loss for names of close relatives, own occupation or own name cause total occupational and social impairment.

Under the General Rating Formula, the Board must conduct a “holistic analysis” that considers all associated symptoms, regardless of whether they are listed as criteria. Bankhead v. Shulkin, 29 Vet. App. 10, 22 (2017); 38 C.F.R. § 4.130. The Board must determine whether unlisted symptoms are similar in severity, frequency, and duration to the listed symptoms associated with specific disability percentages. Then, the Board must determine whether the associated symptoms, both listed and unlisted, caused the level of impairment required for a higher disability rating. Vazquez-Claudio v. Shinseki, 713 F.3d 112, 114-118 (Fed. Cir. 2013). 

The list of symptoms under the rating criteria are meant to be examples of symptoms that would warrant the rating, but are not meant to be exhaustive, and the Board need not find all or even some of the symptoms to award a specific rating. On the other hand, if the evidence shows that the Veteran suffers symptoms or effects that cause occupational or social impairment equivalent to what would be caused by the symptoms listed in the diagnostic code, the appropriate equivalent rating will be assigned. Sellers v. Principi, 372 F.3d 1318, 1326 (Fed. Cir. 2004); Mauerhan v. Principi, 16 Vet. App. 436, 442-43 (2002).

The criteria for a 70 percent rating are met if there are deficiencies in most of the areas of work, school, family relations, judgment, thinking, and mood. Bowling v. Principi, 15 Vet. App. 1, 11-14 (2001).

The Board notes that VA updated its regulations to incorporate, in lieu of the DSM-IV, references to the Fifth Edition of the DSM (DSM-5) which, among other things, eliminates Global Assessment of Functioning (GAF) scores. These changes apply to claims that were certified for appeal to the Board on or after August 4, 2014. See 80 Fed. Reg. 14,308 (March 19, 2015) (Applicability Date). In this case, the DSM-5 is applicable. See March 2018 “Certification of Appeal” form (VA Form 8).

Considering the pertinent evidence in light of the applicable rating criteria and considerations, the Board finds that, for the following reasons, the Veteran’s other specified trauma/stressor related disorder met the criteria for a 70 percent rating, but no higher, during the entire period on appeal.

The Veteran’s claim for an increased rating for his service-connected psychiatric disability was received by VA on November 9, 2016.

VA treatment records dated from November 2015 to December 2016 indicate that the Veteran experienced anxiety, depression, and impaired sleep. He lived with his wife and their adult son and his family and he enjoyed spending time with his grandchildren. He and his wife had a “positive and very supportive marriage” and they enjoyed an active social life together, but there was tension in their home due to the fact that their son and his wife were in the process of divorcing and the Veteran and his wife attended couple’s therapy.

Examinations revealed that the Veteran was well groomed, appropriately dressed, alert, fully oriented, and pleasant. He maintained good eye contact, his mood was occasionally angry/depressed, his affect was congruent with mood, his motor activity was unremarkable, his speech was spontaneous, clear, and coherent, and his thought processes were coherent and goal driven. He occasionally experienced suicidal ideation, violent ideation, paranoid delusions, and flashbacks (triggered by noises and sounds), but there was no homicidal ideation, he did not experience any hallucinations, and his memory, attention, and concentration were all normal. His impulse control was good and his judgment and insight were fair. Diagnoses of PTSD were provided.

The Veteran reported during a February 2017 VA psychiatric examination that he and his wife had been attending marital psychotherapy for the previous 1.5 years due to the Veteran’s frequent agitation, but that they enjoyed multiple hobbies together (e.g., traveling, visiting with friends, going to the beach). He retired as a corrections officer in 1993 due to an injury at work and remained retired at the time of the February 2017 examination, but he did not attribute his retirement or subsequent unemployment to psychiatric symptoms. As for psychiatric symptoms, he experienced recurrent, involuntary, and intrusive distressing memories of traumatic events in service; recurrent distressing dreams in which the content and/or affect of the dreams were related to the traumatic events; marked physiological reactions to internal or external cures that symbolized or resembled an aspect of the traumatic events; avoidance of or efforts to avoid external reminders that aroused distressing memories, thoughts, or feelings about or closely associated with the traumatic events; persistent and exaggerated negative beliefs or expectations about himself, others, or the world; persistent distorted cognitions about the cause or consequences of the traumatic events; irritable behavior and angry outbursts (with little or no provocation); hypervigilance; and sleep disturbance. Also, he experienced a depressed mood and anxiety.

Examination revealed that the Veteran was fully oriented, that his affect was congruent with his mood and symptoms, and that he was relatively calm and responsive. His speech was of normal rhythm and content, he maintained focus on topics and responded appropriately to questions, there was no evidence of a formal thought disorder, insight and judgment were grossly intact, and there was no suicidal ideation, planning, or intent. The Veteran reported excoriation and onychophagia associated with his psychiatric disability, and there was evidence of this observed during the examination. The Veteran was diagnosed as having PTSD. The examiner who conducted the February 2017 examination concluded that the symptoms of the Veteran’s psychiatric disability met the criteria for a 30 percent rating under the General Rating Formula (i.e., occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks, although generally functioning satisfactorily, with normal routine behavior, self-care, and conversation).

VA treatment records dated from April to June 2017 indicate that the Veteran and his wife continued to remain active in the community with friends and family. The Veteran had experienced panic attacks a “few times” while driving in Florida, but they had not recurred. He had frequently experienced panic attacks when he was younger, but they had not occurred in several years. Examinations revealed that the Veteran was alert, pleasant, well groomed, casually dressed, and fully oriented. His mood was bright, his affect was congruent with mood, and he easily engaged in conversation. His speech was clear and coherent, thought patterns were organized, and there was no evidence of any hallucinations or suicidal/homicidal ideation, intent, or plan.

The report of a VA psychiatric examination dated on December 7, 2017 reflects that the Veteran continued to live with his wife, son, daughter-in-law, and two grandchildren, but that his daughter-in-law and grandchildren would soon be moving out because his son and daughter-in-law were getting divorced. The Veteran preferred to stay home rather than go out to socialize, but he did occasionally go out with his wife to dine with acquaintances. He occasionally chatted with neighbors and attended his grandchildren’s sporting events, and he maintained unremarkable relationships with his two children and five grandchildren. Overall, however, he expressed a general distrust of others. At home, he assisted with chores and there was no indication that he had any chronic cognitive impairment that would impair his ability to participate in family financial affairs or perform his daily activities. He retired in 1993 after working for 20 years as a corrections officer because he sustained a physical injury at work, and he specified that he was able to sustain a career without detriments to his occupational functioning related to his mental health.

Moreover, the Veteran reported that over “the last several years” he experienced the onset of depression that had worsened over time. This was associated with intermittent thoughts of self-directed violence, but he had neither acted on nor intended to act on these thoughts. Regardless, his wife was concerned to the point that she had locked up the Veteran’s handgun in their home. Also, during the previous “few years of depression,” he had developed problems with concentration and memory and worsening sleeping difficulties. He was “verbally and mentally abusive” towards his wife because of his poor frustration tolerance. For instance, he would raise his voice at her and speak pejoratively to her. There was never any physical violence between he and his wife, however, and the Veteran was generally able to control his anger without acting physically violent towards extended family or strangers.

With respect to psychiatric symptoms, the Veteran experienced recurrent, involuntary, and intrusive distressing memories of traumatic events in service; recurrent distressing dreams in which the content and/or affect of the dreams were related to the traumatic events; intense or prolonged psychological distress at exposure to internal or external cues that symbolized or resembled an aspect of the traumatic events; persistent and exaggerated negative beliefs or expectations about himself, others, or the world; a persistent negative emotional state; feelings of detachment or estrangement from others; irritable behavior and angry outbursts (with little or no provocation); hypervigilance; and sleep disturbance. Also, he experienced a depressed mood, anxiety, suspiciousness, mild memory loss, and suicidal ideation.

Examination revealed that the Veteran was generally alert, cooperative, and attentive. He had a depressed mood and an appropriate range of emotional expression. He expressed feeling nervous and reported that he would bite his nails and the skin around his nails. There were no current suicidal or homicidal thoughts, intentions, or plans, he did not present as an imminent risk for suicide, and his thinking was organized and reality-based. There was no evidence of any delusions or hallucinations, his gross psychomotor and memory functioning appeared intact, his speech was coherent, and he communicated at an appropriate rate, rhythm, and volume. He demonstrated good judgement and impulse control and he was generally insightful.

The Veteran was diagnosed as having other specified trauma/stressor related disorder and persistent depressive disorder. The examiner who conducted the December 2017 examination explained that the other specified trauma/stressor related disorder was a continuation of the Veteran’s service-connected PTSD, but that the persistent depressive disorder had developed “over the last few years” and was not due to military service. The other specified trauma/stressor related disorder resulted in anxiety and suspiciousness and the persistent depressive disorder resulted in a depressed mood, mild memory loss, and suicidal ideation. Also, both disorders resulted in sleep impairment and disturbances of motivation and mood. Regardless, since both disorders were co-occurring, it would be speculative to distinguish the contribution of each disorder to each of these symptoms. The examiner also concluded that the symptoms of the Veteran’s other specified trauma/stressor related disorder met the criteria for a 50 percent rating under the General Rating Formula (i.e., occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks, although generally functioning satisfactorily, with normal routine behavior, self-care, and conversation.

The examiner further explained that the Veteran’s psychiatric disability would mildly limit his ability to function in an occupational environment. For instance, his ability to understand and follow instructions, sustain concentration to task persistence and pace, and respond appropriately to changes in the work setting were all mildly impaired. His ability to respond appropriately to coworkers, supervisors, or the general public was moderately impaired. Also, his ability to retain instructions and sustain concentration to perform simple tasks and his ability to communicate through speech were intact. The Veteran’s lack of employment since his retirement was due to physical injury, for which he subsequently received SSA disability benefits. Furthermore, since his retirement his physical health had worsened and he had developed a depressive disorder.

Initially, the Board notes that the Veteran was diagnosed as having non-service-connected depressive disorder during the period on appeal. However, where an examiner is unable to distinguish the symptoms of a service-connected disability from non-service-connected manifestations, all the manifestations will be considered part of the service-connected disability. Mittleider v. West, 11 Vet. App. 181, 182 (1998) (citing Mitchem v. Brown, 9 Vet. App. 136, 140 (1996)). In this case, the Board acknowledges that the examiner who conducted the December 2017 VA psychiatric examination specified that the Veteran’s depressed mood, mild memory loss, and suicidal ideation were associated with his depressive disorder and not his service-connected psychiatric disability. Regardless, the Veteran’s treatment records indicate that some of these symptoms (including depression and suicidal ideation) were present prior to the December 2017 examination and were wholly attributed to his service-connected PTSD at that time. Thus, overall, the Board finds that the symptoms of the Veteran’s service-connected psychiatric disability cannot be clearly distinguished from those of his non-service-connected depressive disorder. Therefore, the Board will attribute all of the Veteran’s psychiatric symptoms to his service-connected psychiatric disability for the purposes of assessing the severity of that disability. See Id. 

In light of the above evidence, the Board finds that the symptoms of the Veteran’s service-connected psychiatric disability resulted in deficiencies in most of the areas needed for a 70 percent rating under the General Rating Formula during the entire period on appeal. As for occupational impairment, the Veteran was unemployed during the entire period on appeal. Although he retired in 1993 due to a physical injury at work and he reported that his psychiatric disability did not contribute to his retirement and his continued unemployment, the examiner who conducted the December 2017 examination specified that the symptoms of the Veteran’s psychiatric disability would result in mild to moderate employment limitations if he were to attempt to work. With respect to family relations, the Veteran remained in a long-term marriage, maintained relationships with his wife, children, and grandchildren, and reported on several occasions that he had good relationships with his family. Nevertheless, his family relations were impaired, at least in part, due to his psychiatric disability. For instance, he and his wife were in couple’s therapy during the period on appeal due to the Veteran’s impaired mood and he reported during the December 2017 examination that he was “verbally and mentally abusive” towards his wife because of his poor frustration tolerance. Also, his symptoms of suicidal ideation, paranoid delusions, flashbacks, suspiciousness, impaired concentration and memory, anxiety, depression, and anger are reflective of deficiencies in the areas of thinking and mood.

The Board acknowledges that the examiners who conducted the February and December 2017 VA examinations indicated that the severity of the Veteran’s psychiatric symptoms met the criteria for 30 percent and 50 percent ratings, respectively, under the General Rating Formula. Nevertheless, the Board finds that the overall symptomatology described and demonstrated during the period on appeal most closely approximate the criteria for a 70 percent rating under the General Rating Formula and that a 70 percent rating for other specified trauma/stressor related disorder is warranted during the entire period on appeal. 38 C.F.R. § 4.2 (“It is the responsibility of the rating specialist to interpret reports of examination... so that the current rating may accurately reflect the elements of disability present”).

The Board also finds, however, that a rating higher than 70 percent is not warranted at any time during the period on appeal. The Board acknowledges that the Veteran was not gainfully employed during the entire period on appeal and that there is evidence of occupational impairment due to his service-connected psychiatric disability. Hence, the Board concedes that there is evidence of occupational impairment due solely to the Veteran’s psychiatric disability during the period on appeal.

Regardless, there was not total social impairment. The Veteran remained in a long-term marriage, he lived with his wife and their son and his family, he maintained relationships with his children and grandchildren, and he occasionally socialized with others outside of his family with his wife. Furthermore, the Veteran experienced some impaired memory and concentration, intrusive thoughts, and occasional paranoid delusions. Nevertheless, he did not generally demonstrate gross impairment in thought processes or communication, there were no hallucinations, he was cooperative with examiners and did not exhibit any grossly inappropriate behavior during the period on appeal, he did not experience memory loss for names of close relatives, own occupation, or name, he remained fully oriented to time and place, he was able to perform activities of daily living, and there were only occasional delusions. 

The Board notes that the Veteran did express occasional suicidal ideation, which is similar to persistent danger of self-harm, which is contemplated by the 100 percent criteria. Bankhead, 29 Vet. App. at 19. However, the severity, frequency, and duration of the Veteran’s suicidal ideation did not rise to the level contemplated by the 100 percent disability rating. The Veteran regularly denied thoughts, intent, or a plan involving self-harm and suicidal ideation is contemplated by a 70 percent rating. He did not otherwise exhibit most of the symptoms indicative of a 100 percent rating under the General Rating Formula, and total social impairment was not demonstrated during the period on appeal. 

In sum, the Board finds that, overall, the Veteran did not exhibit most of the symptoms listed in the criteria for the maximum, 100 percent rating under the General Rating Formula as examples of the type and extent, frequency or severity, as appropriate, to indicate both total social and occupational impairment at any point during the period on appeal. Rather, the Veteran’s psychiatric symptoms most closely approximated the criteria for a 70 percent rating under the General Rating Formula during the entire period on appeal. See 38 U.S.C. §§ 1155, 5107(b); 38 C.F.R. §§ 4.7, 4.130, DC 9411.

3. Additional Considerations

As a final point, the Board notes that in conjunction with the increased rating matters decided herein, other than the issue of entitlement to a TDIU which is addressed below, neither the Veteran nor his representative has raised any other related issues, nor have any other such issues been reasonably raised by the record. See Doucette v. Shulkin, 28 Vet. App. 366, 369-70 (2017) (confirming that the Board is not required to address issues unless they are specifically raised by the claimant or reasonably raised by the evidence of record).

III. TDIU

VA will grant a TDIU when the evidence shows that a veteran is precluded, by reason of his service-connected disabilities, from securing and following “substantially gainful employment” consistent with his education and occupational experience. 38 C.F.R. 3.340, 3.341, 4.16; VAOPGCPREC 75-91; 57 Fed. Reg. 2317 (1992).

The central inquiry is, “whether the Veteran’s service-connected disabilities alone are of sufficient severity to produce unemployability.” Hatlestad v. Brown, 5 Vet. App. 524, 529 (1993).

The regulations provide that if there is only one such disability, it must be rated at 60 percent or more; and if there are two or more disabilities, at least one disability must be rated at 40 percent or more, and sufficient additional disability must bring the combined rating to 70 percent or more. Disabilities resulting from common etiology or a single accident or disabilities affecting a single body system will be considered as one disability for the above purposes of one 60 percent disability or one 40 percent disability. 38 C.F.R. 4.16 (a).

The Board must evaluate whether there are circumstances in the Veteran’s case, apart from any non- service-connected condition and advancing age, which would justify a total rating based on individual unemployability due solely to the service- connected conditions. See Van Hoose v. Brown, 4 Vet. App. 361, 363 (1993). Marginal employment shall not be considered substantially gainful employment. Marginal employment generally shall be deemed to exist when a veteran’s earned income does not exceed the amount established by the U.S. Department of Commerce, Bureau of the Census, as the poverty threshold for one person. Marginal employment may also be held to exist, on a facts found basis (including but is not limited to employment in a protected environment such as a family business or sheltered workshop), when earned annual income exceeds the poverty threshold. 38 C.F.R. 4.16 (a). 

Entitlement to a TDIU due to service-connected disabilities from November 9, 2015 to April 26, 2018

The Board notes that the Veteran’s combined disability rating during the period on appeal is now 100 percent. A TDIU is provided where the combined schedular rating for service-connected diseases and disabilities is less than total, or 100 percent. 38 C.F.R. § 4.16 (a). A TDIU is considered a lesser benefit than the 100 percent rating, and the grant of a 100 percent rating generally renders moot the issue of entitlement to a TDIU for the period when the 100 percent rating is in effect. 

Regardless, the receipt of a 100 percent schedular disability rating for a service-connected disability or disabilities does not necessarily moot the issue of entitlement to a TDIU. See Bradley v. Peake, 22 Vet. App. 280 (2008) (holding that a TDIU rating may still form the basis for assignment of special monthly compensation under 38 U.S.C.A. § 1114 (s)). In this case, the Veteran specifically submitted a claim for a TDIU during the period on appeal and the Board has expanded the appeal to include this inferred issue. See Rice, 22 Vet. App. at 447. Hence, this decision will include a consideration as to whether the Veteran is entitled to a TDIU during the period on appeal.

Considering the pertinent evidence in light of the considerations delineated above, the Board finds, for the following reasons, that the Veteran’s service-connected disabilities precluded all substantially gainful employment for which his education and occupational experience would have otherwise qualified him during the entire period on appeal.

During the period on appeal, the Veteran was service-connected for the following disabilities: other specified trauma/stressor related disorder (previously diagnosed as PTSD), now rated 70 percent disabling; migraine headaches, now rated 50 percent disabling; peripheral neuropathy of the right upper extremity, rated 30 percent disabling; peripheral neuropathy of the left upper extremity, rated 20 percent disabling; peripheral neuropathy of the right lower extremity, rated 20 percent disabling; peripheral neuropathy of the left lower extremity, rated 20 percent disabling; dermatophytosis, rated 10 percent disabling; type II diabetes mellitus, rated 10 percent disabling; and conjunctivitis, rated noncompensable. The Board is also awarding service connection for bilateral hearing loss and tinnitus and the AOJ will assign initial disability ratings for these disabilities in a future decision. The Veteran’s combined disability rating was 100 percent. Hence, he met the percentage requirements for a TDIU during the period on appeal. See Id. The remaining question is whether his service-connected disabilities precluded gainful employment for which his education and occupational experience would have otherwise qualified him.

In addition to the evidence noted above with respect to the Veteran’s service-connected migraine headaches and psychiatric disability, the reports of VA examinations dated in April 1970, September 1970, August 1971, April 1997, April 2011, and June 2013, and the transcript of an August 1983 hearing indicate that the Veteran completed 2 years of college and that he had employment experience as a messenger/clerk for a department store, a meter reader for a gas company, an electrician’s helper, a truck driver, a route man for a dairy company, and a postal worker. His last period of employment was as a corrections officer at a prison from 1973 to 1993, at which time he retired on disability due to injuries sustained at work.

The report of a VA neurological examination dated in May 2017 and an October 2017 “Veteran’s Application for Increased Compensation Based on Unemployability” form (VA Form 21-8940) indicate that the Veteran experienced constant numbness with a pins and needles sensation in his feet due to diabetic peripheral neuropathy. As a result, he had loss of balance, was afraid of falling, and walked with a slower gait. Also, he experienced numbness with intermittent tingling in his fingers bilaterally and a loss of grip strength. He completed 2 years of college, had training in criminal justice, stopped working as a corrections officer in September 1993, and contended that he was unable to secure or follow any substantially gainful occupation due to his service-connected psychiatric disability.

Examination revealed decreased hand grip strength (4/5) bilaterally, decreased ankle plantar flexion and dorsiflexion (3/5) bilaterally, decreased sensation to light touch at the hands/fingers and feet/toes bilaterally, absent vibration sensation in the lower extremities bilaterally, and decreased cold sensation in the lower extremities bilaterally. Overall, there was moderate incomplete paralysis of the median and sciatic nerves bilaterally. The Veteran was diagnosed as having diabetic peripheral neuropathy. This disability impacted his ability to work in that it resulted in loss of balance, he was unable to walk or stand for long periods of time, he was unable to drive, and he was unable to do any tasks that required fine motor skills of the hands.

In sum, the Board finds that the Veteran completed 2 years of college, that he had training in criminal justice, and that most of his employment experience involved predominantly physical activities (e.g., as a messenger/clerk for a department store, a meter reader for a gas company, an electrician’s helper, a route man for a dairy company, and a corrections officer). Although he retired in 1993 due to non-service-connected physical disability sustained at work and he did not report any significant occupational impairment while he was employed due to his service-connected disabilities, his medical records and lay statements reflect significant impairments from his service-connected migraine headaches, psychiatric disability, and peripheral neuropathy (including, but not limited to, frequent and severe prostrating attacks of headache pain, impaired concentration and memory, irritability and anger, distrust of others, upper and lower extremity numbness, decreased grip strength, decreased strength in the lower extremities, and instability) that would prevent him from performing any type of employment. 

The above discussion of the severity of the symptoms of the Veteran’s service-connected disabilities and his educational and occupational experience reflects that the preponderance of the evidence is in favor of a conclusion that he was unable to secure and follow substantially gainful employment as a result of his service-connected disabilities during the entire period on appeal. Hence, entitlement to a TDIU is warranted. 38 U.S.C. 5107 (b); 38 C.F.R. 3.102.

REASONS FOR REMAND

Entitlement to a rating in excess of 10 percent for type II diabetes mellitus is remanded.

The issue of entitlement to an increased rating for type II diabetes mellitus is remanded to correct duty to assist errors that occurred prior to VA’s receipt of the Veteran’s April 2018 RAMP election form. A VA diabetes examination was most recently conducted in May 2017, but the evidence of record prior to the April 2018 RAMP election form indicates that the Veteran’s diabetes may have worsened since the May 2017 examination. For instance, the May 2017 examination report indicates that the Veteran was not taking any medication for his diabetes. In the Veteran’s August 2017 notice of disagreement, however, his representative indicated that he was prescribed an oral hypoglycemic agent (Metformin) for his diabetes. Hence, the Veteran should be provided an opportunity to report for a VA examination to ascertain the current severity and manifestations of his service-connected diabetes.

Also, prior to the June 2017 rating decision on appeal, evidence associated with the Veteran’s claims file (including a May 2017 letter from D.B. Kugler) reflects that the Veteran received treatment for his diabetes from Dr. Kugler. A remand is required to allow VA to obtain these relevant outstanding records.

Lastly, the evidence indicates that there may be outstanding relevant VA treatment records. The most recent VA treatment records in the claims file are from the Northport Vista electronic records system (dated to June 2017) and the VA Medical Center (VAMC) in West Palm Beach, Florida (dated to March 2017). Any VA treatment records are within VA’s constructive possession, and are considered potentially relevant to the remaining issue on appeal. A remand is required to allow VA to obtain them.

The matter is REMANDED for the following action:

1. Ask the Veteran to identify the location and name of any VA or private medical facility where he has received treatment for diabetes, to include the dates of any such treatment.

Ask the Veteran to complete a VA Form 21-4142 for all records of his treatment for diabetes from Dr. Kugler and any other sufficiently identified private treatment provider from whom records have not already been obtained. Make two requests for any authorized records, unless it is clear after the first request that a second request would be futile.

2. Obtain the Veteran’s outstanding VA treatment records from the Northport Vista electronic records system for the period since June 2017; from the VAMC in West Palm Beach, Florida for the period since March 2017; and all such relevant records from any other sufficiently identified VA facility.

3. After all efforts have been exhausted to obtain and associate with the claims file any additional treatment records, schedule the Veteran for an examination by an appropriate clinician to determine the current severity of his service-connected diabetes mellitus. The examiner should provide a full description of the disability and report all signs and symptoms necessary for evaluating the Veteran’s disability under the rating criteria. 

(Continued on the next page)

 

The examiner must provide reasons for any opinion given.

 

Jonathan Hager

Veterans Law Judge

Board of Veterans’ Appeals

ATTORNEY FOR THE BOARD B. Elwood, Counsel